## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
## WESTERN DIVISION

Corey Arredondo,                                    Case No. 3:21-cv-00709-JGC

        Plaintiff

      v.                                            **ORDER**

Beer Barrel Inc., *et al.*,

        Defendants.

This is an employment discrimination case. Plaintiff, Corey Arredondo, brings claims for race discrimination and retaliation for raising a complaint of race discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. 2000e-2 *et seq.*, and analogous provisions of Ohio law, R.C. § 4112.01 *et seq.*, against his former employer, Beer Barrel Inc. ("Beer Barrel"), and two of his supervisors, Jim Fowler and Kristen Koester (Swihart[1]). These claims arise from Beer Barrel's termination of Arredondo on or about March 10, 2020.

Pending is the defendants' motion for summary judgment, which he submitted on May 2, 2022. (Doc. 19). The plaintiff opposed the motion on June 15, 2022, (Doc. 21), and the defendants replied on July 14, 2022, (Doc. 23). For the following reasons, I grant the motion.

### Background

### 1.     Employment History at Beer Barrel

Arredondo is Hispanic and Mexican-American. (Doc. 14, pgID 121). On July 22, 2019, Arredondo began his employment as a dishwasher at the Beer Barrel bar and restaurant in

---

[1] Koester got married in September 2021 and changed her last name. (Doc. 16, pgID 543). I refer to her by her maiden name, "Swihart," as that is how both parties continue to reference her in their filings.

Findlay, Ohio. (*Id.*, pgID 133, 135). His immediate supervisors included Fowler and Swihart, who were Beer Barrel restaurant managers. (*Id.*, pgID 138; Doc. 15, pgID 417-18). In the first few months of Arredondo's employment, he received positive feedback regarding his job performance. On August 5, Beer Barrel gave him a raise. (Doc. 21-11, pgID 833). On October 31, Arredondo received an "Above Average" 90-day performance review, (Doc. 21-10, pgID 832), which led to a second raise on November 11, (Doc. 21-11, pgID 833; Doc. 14, pgID 136-37). He was also promoted at some point during his employment to dough maker, (Doc. 14, pgID 135), although he still worked as a dishwasher on certain shifts, (Doc. 16, pgID 593-94).

There were at least two other Hispanic employees at the Findlay Beer Barrel during Arredondo's employment. One employee, Roy Lopez, was a cook, and the other, Alejandro Sandoval, was a dishwasher and custodian (Doc. 14, pgID 133, 208; Doc. 16, pgID 580).

### 2. Cleaning Duties

Beer Barrel's written job description for dishwashers specified "[d]aily and weekly cleaning duties," in addition to dishwashing, as a responsibility of the position, (Doc. 17-10, pgID 768). Restaurant managers occasionally asked dishwashers to clean the restaurant, (Doc. 14, pgID 208-09).

During Arredondo's employment, Swihart asked him approximately "four or five" times to clean the restaurant bathrooms. (*Id.*, pgID 207). Arredondo admits that it was "not unusual" for managers to ask Caucasian dishwashers to clean the restrooms as well. (*Id.*, pgID 208-09). However, Alejandro Sandoval, who, by Arredondo's admission, was the designated custodian in addition to being a dishwasher, handled most cleaning duties when he was on shift. (*Id.*, pgID 208).

Despite Swihart's requests for him to do so, Arredondo admits that he never actually cleaned the bathrooms. (*Id.*, pgID 209-10). He attributed his aversion to having a "sensitive stomach" and was always able to have other employees do it for him. (*Id.*). Arredondo admits that his managers never disciplined or punished him for declining to clean the bathrooms himself. (*Id.*).

On one occasion, one of Beer Barrel's managers[2] asked Arredondo to climb a tall ladder to clean the kitchen ceiling. (*Id.*, pgID 211). Because Arredondo is afraid of heights, he had another employee clean the ceiling for him. (*Id.*, pgID 211-12). Again, Arredondo admits that his managers did not discipline or punish him for declining to climb the ladder and clean the ceiling. (*Id.*).

At some point during his employment, Arredondo asked Fowler why the managers would always delegate cleaning tasks to Beer Barrel's Hispanic employees—namely himself and Sandoval. (*Id.*, pgID 179-80).[3] Arredondo alleges Fowler responded, "with a smirk on his face," that it was because "that's all we're good for." (*Id.*). Arredondo alleges that Fowler's statement is discriminatory on the basis of his race and/or national origin. (Doc. 21, pgID 802).

### 3. Complaint About Alleged Drug Deal

On or about December 22, 2019, Arredondo witnessed Laura Mackenzie, a Caucasian dishwasher and a teenage minor, ask employees in the kitchen, including Arredondo, if they could help her acquire marijuana. (Doc. 14, pgID 187-91; Doc. 21-2, pgID 820). Arredondo told

---

[2] Arredondo could not recall the specific manager. (*Id.*, pgID 211).

[3] I note that, at two other points in his deposition testimony, Arredondo testifies that he asked the question in a different way—asking Fowler why only Sandoval, not all Hispanic employees, had to clean. (Doc. 14, pgID 179-80, 182). But viewing the evidence in the light most favorable to the plaintiff, I adopt Arredondo's alternative account of the exchange, in which he alleges that he asks Fowler why the Hispanic employees had to clean.

her that he did not know where to get it. (Doc. 14, pgID 187-91). However, that same day, Beer Barrel terminated Sacquoya White, an African-American server, who allegedly attempted to sell the marijuana to Mackenzie. (Doc. 21-2, pgID 820). White informed Arredondo and other Beer Barrel employees about her termination on the day it happened. (Doc. 14, pgID 194).

Mackenzie was not terminated for allegedly asking for the marijuana. (*Id.*, pgID 203-04). The next day, Arredondo verbally complained to the three Beer Barrel managers on shift, including Swihart, that it was unfair for them to terminate only White. (*Id.*, pgID 203-06). Arredondo admits in his deposition, however, that he never "made a claim of racial discrimination" at any point during his employment, including when he complained about the unfairness of White's termination. (*Id.*, pgID 220). Arredondo also admits that he suffered no adverse employment consequences for raising his verbal complaint. (*Id.*, pgID 205-06). After raising his verbal complaint, Arredondo alleges receiving harassing phone calls from unknown callers for a period of time. (*Id.*, pgID 214, 223, 268).

### 4.  Discipline and Termination

Employees at Beer Barrel may purchase food from the restaurant at a discounted rate. (Doc. 14, pgID 145). On February 20, 2020, Arredondo purchased a garden salad that included extra toppings, bacon and egg, which he had not paid for. (*Id.*, pgID 146). Swihart noticed, issued Arredondo a verbal warning, and charged him for the extra toppings. (*Id.*, pgID 146-47).

On March 7, sixteen days later, Arredondo purchased a pizza and, without paying for it, personally added extra bacon to the pizza. (*Id.*, pgID 151). Swihart, who was assisting the staff in the kitchen, noticed the unpaid-for toppings, issued Arredondo a written warning, and placed him on a three-day suspension. (Doc. 21-5, pgID 824). Arredondo refused to sign the verbal warning

4

form until speaking to Fowler. (Doc. 14, pgID 153). He also told Swihart that the write-up and

suspension were "bullshit." (Doc. 14, pgID 153).

That night, Arredondo posted the following statement, which I have edited for clarity, on

his Facebook page:

> Beyond PISSED [right] now…[just remember you] have to tell her right away if [your
> toppings are] not there…[don't] make the [mistake I] did [and] put [your] toppings on it
> [and] get side [tracked because] she tells [you] to get all this stuff [done and] forget to tell
> her right away or [you'll get] SUSPENDED [because you're a liar and you're] stealing
> food….#FuckedOverSumMore

(Doc. 21-6, pgID 825). Some Beer Barrel employees saw the post. (Doc. 16, pgID 624-26). One

of them[4] texted a screenshot of it to her. (Doc. 16, pgID 624-26). Swihart forwarded the

screenshot to Joshua Mangini, a Beer Barrel's regional manager, who then sent it to Beer

Barrel's Vice President, Tony Heaphy. (*Id.*, pgID 626; Doc. 17, pgID 728-29). Mangini,

referencing the two recent instances of unpaid food, recommended terminating Arredondo to

Heaphy. (Doc. 15, pgID 482, 486; Doc. 17, pgID 740). Heaphy agreed and made the final

decision to terminate Arredondo on or about March 10, 2020. (*Id.*; Doc. 17, pgID 739; Doc. 14,

pgID 244). Swihart denies any involvement in the termination decision. (Doc. 16, pgID 636).[5]

Fowler telephoned Arredondo that Beer Barrel was terminating him because his

Facebook post came to the attention of Beer Barrel's senior leadership. (Doc. 14, pgID 245).

Heaphy states that the reason for Arredondo's termination was the Facebook post combined with

---

[4] Swihart cannot remember who. (Doc. 16, pgID 624-26).
[5] Arredondo claims that Swihart made the decision to terminate him. He says that "[b]oth
Heaphy and Mangini claimed they alone were the actual ones who made the termination
decision," which casts doubt on defendants' position that Heaphy was ultimately responsible for
the decision. (Doc. 21, pgID 812). After reviewing the deposition testimonies, I find defendants'
explanation sufficiently clear. Mangini testified that he raised the termination decision with
Heaphy, who "agreed." (Doc. 15, pgID 482). Heaphy was therefore the final decisionmaker.
(*Id.*). The record does not support Arredondo's contention of inconsistencies in the testimonies
of Heaphy and Mangini.

the two instances of unpaid food that had occurred within the previous sixteen days. (Doc. 17, pgID 740). An internal termination form, which Beer Barrel's office manager completed almost two months after Arredondo's last day, lists the reason for his termination as "theft." (Doc. 21-7, pgID 826).

As referenced in their employee handbook, Beer Barrel has a progressive discipline policy in place for employee rule breaking. (Doc. 17, pgID 682; Doc. 14-1, pgID 330). Generally, there are four steps of progressive discipline: (1) a verbal warning; (2) a written warning; (3) a suspension; and (4) termination. (Doc. 14-1, pgID 330). The policy provides that "[t]here may be particular situations, however, in which the seriousness of the offense justifies the omission of one or more of the steps in the procedure." (*Id.*). It also states that employee theft can, following an investigation, be immediate grounds for a suspension and termination. (*Id.*).

Beer Barrel also has a social media policy in their employee handbook. The policy prohibits employees from posting "complaints or criticism . . . that reasonably could be viewed as malicious, obscene, threatening or intimidating, that disparage . . . members . . . or that might constitute harassment or bullying." (Doc. 14-1, pgID 318). It also states the following:

> Keep in mind that any of your conduct that adversely affects your job performance, the performance of fellow associates or otherwise affects members, customers, suppliers, people who work on behalf of Beer Barrel, or Beer Barrel's legitimate business interests, may result in disciplinary action up to and including termination.

(Doc. 14-1, pgID 318).

Beer Barrel's records indicate that Arredondo received a copy of the employee handbook, (Doc. 14-2, pgID 331), and Arredondo does not dispute receiving it, (Doc. 14, pgID 136).

### 5.  Alleged Discrimination and Retaliation

Arredondo alleges that his managers at Beer Barrel disciplined him, terminated him, and generally treated him differently because of his race. (Doc. 1, pgID 10-11). He points to Fowler's

6

alleged comment that cleaning was all that Sandoval and Arredondo, two Hispanic employees, were "good for." (Doc. 14, pgID 179-80).

Arredondo testified that Beer Barrel did not discipline two Caucasian employees, who engaged in conduct similar to his own. He testified that a Caucasian dishwasher, Wayne Sparks, got "extra privileges" relative to other employees. (*Id.*, pgID 259). For instance, Sparks would add food to his orders that would not appear on the charged tickets and would "mess around" instead of work. (*Id.*, pgID 252-53). Beer Barrel managers, including Fowler and Swihart, were aware of some of Sparks' infractions and, according to Arredondo, "would talk to him all the time about stuff like that," but "would just continue to let him go." (*Id.*, pgID 254). On December 30, 2020, after Arredondo's termination, Beer Barrel terminated Sparks for failure to report to work. (Doc. 23-7, pgID 916-17).

As for the issue of uncharged food, Swihart testified that she fired a Caucasian server named "Heidi" "a few years ago" for not paying for extra toppings on pizzas for herself.[6] (Doc. 16, pgID 612-13).

Sparks also allegedly made Facebook posts, which Arredondo claims are equally as inappropriate and violative of Beer Barrel's social media policy as the one Arredondo made. Sparks' Facebook posts, which were all dated October 16, 2016, contain offensive images and

---

[6] Plaintiff contends that Swihart's testimony regarding her termination of "Heidi" is inadmissible because it is not based on personal knowledge. (Doc. 21, pgID 803). Plaintiff points to Swihart's inability to recall many details regarding the termination, including the employee's last name, any previous discipline she received, and when exactly the termination occurred. (*Id.*). "A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Fed. R. Evid. 602. Swihart's testimony, though lacking some details, suffices to meet this bar because it relates to an action that she herself took as a manager. *See United States v. Hickey*, 917 F.2d 901, 904 (6th Cir. 1990) ("Testimony should not be excluded for lack of personal knowledge unless no reasonable juror could believe that the witness had the ability and opportunity to perceive the event that he testifies about.").

inappropriate language. (Doc. 23-2, pgID 869-72). But Sparks' employment with Beer Barrel began on November 1, 2018—over two years after he made the Facebook posts in question. (Doc. 23-7, pgID 916-17). Arredondo has also not alleged that Beer Barrel was aware of Sparks' Facebook posts before he filed this lawsuit.

 Arredondo also points to a Facebook post by Dustin Rice, a Caucasian cook, as an example of another violation of Beer Barrel's social media policy that went unpunished. The post, dated February 26, 2018, was a meme showing a picture of a monkey and stating: "Everyday at work I worry that I'm going to scream 'shut the fuck up' out loud instead of in my head." (Doc. 21-8, pgID 827). Arredondo alleges that Beer Barrel was likely aware of Rice's post because Luke Baldridge, the general manager of the Findlay Beer Barrel, was his Facebook friend. (Doc. 14-7, pgID 370-73). Mangini and Heaphy both testified that they do not think Rice's post violated the social media policy. (Doc. 15, pgID 495; Doc. 17, pgID 744). Heaphy's reasoning is that Arredondo's post specifically targeted an individual manager, Swihart, while Rice's post was only about feeling general frustration at work. (Doc. 17, pgID 744).

Aside from these specific episodes, Arredondo also alleges that Swihart would generally treat him differently from Caucasian employees by having an "attitude" toward him, getting angry at him, and making negative comments to him. (Doc. 14, pgID 176-77).

Finally, Arredondo alleges that Beer Barrel retaliated against him for verbally complaining to his managers that the termination of an African-American employee, Sacquoya White, discussed *supra*, was unfair. (*Id.*, pgID 203-06).

### Standard of Review

Summary judgment is appropriate under Federal Rule of Civil Procedure 56 where the opposing party fails to show the existence of an essential element for which that party bears the burden of proof. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The movant initially must show the absence of a genuine issue of material fact. *Id.* at 323. "[I]f the moving party seeks summary judgment on an issue for which it does not bear the burden of proof at trial, the moving party may meet its initial burden by showing that 'there is an absence of evidence to support the nonmoving party's case.'" *Lindsey v. Whirlpool Corp.*, 295 F. App'x 758, 764 (6th Cir. 2008) (quoting *Celotex*, *supra*, 477 U.S. at 325).

Once the movant carries its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). Rule 56 "requires the nonmoving party to go beyond the [unverified] pleadings" and submit admissible evidence supporting its position. *Celotex*, *supra*, 477 U.S. at 324.

I should grant summary judgment where "in light of the evidence viewed in the light most favorable to the plaintiff, no reasonable juror could fail to return a verdict for the defendant." *Benison v. Ross*, 765 F.3d 649, 658 (6th Cir. 2014).

## Discussion

### 1. Discrimination

Arredondo brings claims of race discrimination against defendants under Title VII, 42 U.S.C. § 2000e-2 *et seq.* and R.C. § 4112.01 *et seq.* He argues that the defendants disciplined and ultimately terminated him because he is Hispanic.[7]

A plaintiff may establish a discrimination claim by "direct evidence" or, if no such evidence exists, with "indirect evidence" under the burden-shifting framework set forth in *McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802-03 (1973). *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 606 (6th Cir. 2019). I analyze both plaintiff's state and federal claims under "the Title VII framework." *Carter v. Univ. of Toledo*, 349 F.3d 269, 272 (6th Cir. 2003) (citing *Ohio Civil Rights Comm'n v. Ingram*, 630 N.E.2d 669, 674 (Ohio 1994).

Arredondo presents no direct evidence and, instead, argues that his claim satisfies the *McDonnell Douglas* burden-shifting framework. (Doc. 21, pgID 808). Under the *McDonnell Douglas* framework, the plaintiff must first make out a *prima facie* case of discrimination. *Redlin, supra,* 921 F.3d at 606. To do so, he must demonstrate the following: (1) he is part of a protected class; (2) he was qualified for the job; (3) he suffered an adverse employment decision; and (4) he was replaced by someone outside the protected class or was treated differently than similarly situated non-protected employees. *Id.* (citing *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 391 (6th Cir. 2008).

---

[7] "Hispanic" is an ethnicity, not race, category, but Title VII's prohibition on race discrimination encompasses discrimination due to ethnicity. *See Ortiz v. Hershey Co.*, 580 F. App'x 352, 356 (6th Cir. 2014) (recognizing a Hispanic employee as a member of a protected group for the purposes of a race discrimination claim).

Once the plaintiff makes out a *prima facie* case, the defendants must then "articulate some legitimate nondiscriminatory reason" for the adverse employment action. *Id.* at 607 (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

Should the defendants succeed in articulating a legitimate nondiscriminatory reason, the burden then shifts back to the plaintiff to "prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination." *Id.*

## A. *Prima Facie* Case of Race Discrimination

The parties do not dispute that Arredondo was a Hispanic man, who was qualified for the job. They also do not dispute that he suffered an adverse employment action in the form of employee discipline[8] and termination.

Arredondo therefore has satisfied the first three elements of his *prima facie* case.

Defendants' sole attack on Arredondo's *prima facie* case is that he has not established the last element—*i.e.* Beer Barrel, Swihart, and Fowler did not treat Arredondo differently than similarly situated non-protected employees.[9] I agree.

Comparators must be "similarly situated" to a plaintiff "in all of the relevant respects to an employee of a different race who was treated better." *Johnson v. Ohio Dep't of Pub. Safety*, 942 F.3d 329, 331 (6th Cir. 2019) (internal quotations and citations omitted). Relevant factors can include whether the employees: "(1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards." *Id.* (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). But the Sixth Circuit is also clear that these factors are not rigid

---

[8] Discipline that puts an employee "in jeopardy of suffering" a "tangible employment action" constitutes an adverse employment action. *See Baxter Healthcare Corp.*, 533 F.3d at 402 (quoting *Morris v. Oldham Cnty. Fiscal Ct.*, 201 F.3d 784, 789 (6th Cir. 2000)).

[9] Arredondo does not contend that defendants replaced him with a non-Hispanic employee.

and that I am to "make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Redlin, supra*, 921 F.3d at 610 (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)).

A plaintiff alleging discriminatory treatment in the form of employee discipline bears the burden of establishing that a comparator employee's actions were of "comparable seriousness to his or her own infraction." *Mitchell, supra*, 964 F.2d at 583 n.5. As I stated in *Quinn-Hunt v. Bennett Enterprises, Inc.*, the requirement of "comparable seriousness" is "logical because an employer is justified in responding differently to different kinds of work-related infractions, such as those of greater frequency or severity." No. 3:02CV7195, 2005 WL 2174053, at *3 (N.D. Ohio Sept. 7, 2005), *aff'd*, 211 F. App'x 452 (6th Cir. 2006).

Here, I find most relevant that Arredondo, a dishwasher and dough maker reporting directly to Fowler and Swihart, received discipline for violating the employee handbook three times over sixteen days: twice for failing to pay for extra food that he ordered for himself at the restaurant and once for an inappropriate social media post specifically targeting Swihart, albeit not by name.

Arredondo identifies Sparks and Rice as comparators—Caucasian employees, who engaged in similar conduct as him without the same consequences. Neither are similarly situated to Arredondo because their alleged infractions were not comparably serious to his own.

Arredondo notes that Sparks would add uncharged food to his personal orders and "mess around" instead of work. (Doc. 14, pgID 252-53). Arredondo also testified that Beer Barrel's managers were aware of at least some of these infractions but that they would merely "talk to him"—*i.e.* issue verbal warnings without any further action. (*Id.*, pgID 254).

12

On February 20, 2020, Swihart issued a verbal warning to Arredondo the first time she caught him with uncharged food in his personal order. (Doc. 14, pgID 146-47). She verbally warned him and gave him a three-day suspension only after catching him engaging in the same behavior on March 7, just sixteen days later. (Doc. 21-5, pgID 824). Arredondo suggests that Sparks received verbal warnings for similar infractions, but there is no evidence that Sparks committed multiple such infractions in a similarly short period of time without receiving harsher punishment in the form of a written warning and/or suspension.[10] [11]

The same night Swihart suspended Arredondo, he wrote a profane Facebook post—visible to at least some other Beer Barrel employees—which obviously targeted Swihart for her decision to suspend Arredondo. (Doc. 21-6, pgID 825). Beer Barrel's VP, Tony Heaphy, emphasized in his testimony that it was the combination of these three infractions that ultimately

---

[10] Additionally, Swihart testified that she previously fired a Caucasian server named "Heidi" for adding uncharged toppings to her pizza. (Doc. 16, pgID 612-13). To be clear, there are independent reasons why Arredondo fails to establish Sparks and Rice as similarly situated comparators—namely, the absence of comparably serious conduct, as further discussed *infra*. But it is worth noting that Swihart's termination of a Caucasian employee for theft of extra toppings greatly undercuts Arredondo's contention that only Hispanic employees received discipline for the same conduct.

[11] Arredondo argues that "Swihart's retaliatory (and discriminatory) animus is imputed to Heaphy and Mangini through cat's paw liability." (Doc. 21, pgID 812-13). He does so because the decision to terminate Arredondo relied on disciplinary decisions that Swihart alone made. (*Id.*). I find Arredondo's "cat's paw" argument without merit. This is so because Swihart terminated a Caucasian server, "Heidi," for stealing pizza toppings. (Doc. 16, pgID 612-13). This dispels Arredondo's claim that Swihart's discipline of him for similar conduct was discriminatory. *See supra* note 10. Additionally, Mangini and Heaphy both testified that Arredondo's Facebook post targeting Swihart was a serious violation of Beer Barrel's social media policy. (Doc. 15, pgID 485; Doc. 17, pgID 737). A violation of Beer Barrel's social media policy suffices as grounds for termination (Doc. 14-1, pgID 318). Even though Heaphy's termination decision relied on all three of Arredondo's infractions, he also stated that he ultimately made his decision to make sure Beer Barrel would continue to provide "a safe and hospitable and welcoming" workplace. (Doc. 17, pgID 737). This indicates that the Facebook post, alone, sufficed for Heaphy's decision to terminate Arredondo. There is no evidence that Swihart took part in disciplinary conversations regarding the Facebook post, so her alleged discriminatory animus cannot be imputed to Heaphy.

led him to terminate Arredondo's employment. (Doc. 17, pgID 737). There is no evidence that Sparks committed infractions with the same frequency and severity to show that his actions were of "comparable seriousness" to Arredondo's.

Although Arredondo also points to offensive images and profane language in Facebook posts that Sparks wrote as violations of Beer Barrel's social media policy, these posts are irrelevant, as Sparks posted all of them over two years before beginning his employment with Beer Barrel. (Doc. 23-7, pgID 916-17).

Arredondo's reliance on Dustin Rice as a comparator also fails. Arredondo points to a Facebook post Rice made, while employed at Beer Barrel, that expressed, with profane language, general frustration with work—*i.e.* the desire to scream "shut the fuck up" out loud at work instead of in his head. (Doc. 21-8, pgID 827). Arredondo argues that this was an unpunished violation of Beer Barrel's social media policy, whereas his own Facebook post precipitated his termination. Like Sparks, Rice is not a satisfactory comparator because his purported infraction did not occur with the same frequency or rise to the same level of severity as Arredondo's three handbook violations over sixteen days. Heaphy's testimony correctly distinguishes Rice's Facebook post as a non-violation of Beer Barrel's social media policy because it was speaking to general frustrations at work, unlike Arredondo's, which was "clearly targeting a specific manager." (Doc. 17, pgID 737).

Arredondo's failure to establish Sparks and Rice as comparators is consistent with the Sixth Circuit's holding in *Quinn-Hunt v. Bennett Enterprises, Inc.*, 211 F. App'x 452 (6th Cir. 2006). The plaintiff in *Quinn-Hunt* had received discipline multiple times for frequently arriving late to work and falling asleep on the job. *Id.* at 454. Her employer finally terminated her after one instance of excessive tardiness. *Id.* The plaintiff sought to establish two other employees,

14

who had allegedly also arrived late to work, as comparators. *Id.* at 458. The Sixth Circuit disagreed—finding that the proposed comparators were not "similarly situated" because they were never "*excessively* tardy," nor did they have "additional" types of infractions as the plaintiff did for sleeping on the job. *Id.* The severity and frequency of Arredondo's infractions similarly distinguish him from his comparators.

Arredondo alleges that defendants treated Hispanic employees differently by making Sandoval and himself, the only two Hispanic dishwashers, handle cleaning duties. The record manifestly dispels this contention. Arredondo admits that Sandoval, in addition to being a dishwasher, was Beer Barrel's designated custodian and was primarily responsible for cleaning duties, although dishwashers would sometimes share in those duties. (Doc. 14, pgID 208). Cleaning was a fundamental part of Sandoval's job, and it is not evidence of disparate treatment if managers would ask him to do so.

There is likewise no evidence of disparate treatment of Hispanic employees when Beer Barrel managers asked Arredondo to clean the bathrooms, and, on one occasion, to climb a ladder to clean the ceiling. First, Arredondo admits in his testimony that he never cleaned the bathrooms or the ceiling at any point, even when his managers asked him to. (*Id.*, pgID 209-12). Arredondo's managers never disciplined him for having other coworkers shoulder those tasks. (*Id.*). Second, Arredondo unambiguously testifies that Beer Barrel managers would regularly ask Caucasian dishwashers to assist with cleaning duties. (*Id.*, pgID 208-09). In light of these admissions, Arredondo's evidence-free assertion that only Hispanic employees were subject to cleaning duties is untenable. The Sixth Circuit is clear that "[c]onclusory statements unadorned with supporting facts are insufficient to establish a factual dispute that will defeat summary

judgment." *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020) (quoting *Alexander v. CareSource*, 576 F.3d 551, 560 (6th Cir. 2009)).

Additionally, Arredondo points to an alleged discriminatory statement that Fowler made—that Arredondo and Sandoval were the only ones that Beer Barrel's managers would put on cleaning duty because "that's all we're good for," (Doc. 14, pgID 179-80)—as another instance of differential treatment relative to similarly situated, non-Hispanic employees. Fowler's comment, standing alone, might appear ambiguously discriminatory toward Hispanic employees. But I consider it to be clearly discriminatory when viewing the evidence in the light most favorable to Arredondo. To be sure, Hispanics and Latinos are subject to stereotypes that pigeonhole them into cleaning and janitorial tasks. *See* Tre'vell Anderson, *4 Latino stereotypes in TV and film that need to go*, LOS ANGELES TIMES (April 27, 2017).[12]

Discriminatory remarks are circumstantial evidence of disparate treatment when "the statements "can be imputed to the ultimate decisionmaker" of the adverse employment action, *See Clack v. Rock-Tenn Co.*, 304 F. App'x 399, 404 (6th Cir. 2008), or to individuals "who may have influenced the decision," *Ercegovich, supra*, 154 F.3d at 355.[13]

Fowler's evidence falls under neither category. Arredondo does not claim that Fowler influenced Heaphy's final decision to terminate Arredondo—or that Fowler himself made that

---

[12] *Available at* https://www.latimes.com/entertainment/movies/la-et-mn-latino-stereotypes-20170428-htmlstory.html.

[13] The plaintiffs in *Clack* and *Ercegovich* contended that the discriminatory remarks in those cases were evidence that the legitimate non-discriminatory reasons proffered for the adverse employment actions at issue were pretext. *Clack, supra*, 304 F. App'x at 404; *Ercegovich, supra*, 154 F.3d at 355. Arredondo argues that Fowler's discriminatory remark is evidence that Fowler treated him less favorably than similarly situated employees—*i.e.* for the purpose of establishing a *prima facie* case. (Doc. 21, pgID 809). Because the Sixth Circuit has not established a bright line rule that discriminatory remarks must fall within a specified step of the burden shifting analysis, I adopt plaintiff's analytical framework and evaluate whether the discriminatory remark at issue weighs in favor of his *prima facie* case.

16

decision. Instead, Arredondo attributes that decision to Heaphy and/or Swihart. (Doc. 21, pgID 812-13). Fowler's alleged remark therefore has no bearing on the success of Arredondo's *prima facie* case. *See Clack, supra*, 304 F. App'x 406 (finding that a direct supervisor's racially discriminatory remark did not serve as "circumstantial evidence of individualized discrimination" when the supervisor took no part in any discussion regarding the decision to terminate the plaintiff).

For all these reasons, Arredondo has failed to establish a genuine issue of material fact regarding his differential treatment relative to similarly situated, non-Hispanic employees. He has therefore not established his *prima facie* case, and I could grant defendants' motion as to the race discrimination claims on that basis. Nonetheless, I will apply the burden-shifting analysis to the evidence in the case.

### B. Legitimate Non-Discriminatory Reason and Pretext

Even if Arredondo had established a *prima facie* case, he cannot prove that the defendants' legitimate articulated reasons are pretextual. Heaphy has articulated a legitimate, nondiscriminatory reason for terminating Arredondo: three employee infractions over the course of sixteen days, with the last infraction being a profane Facebook post that violated Beer Barrel's social media policy by targeting a specific supervisor. (Doc. 17, pgID 744).

Arredondo contends that Heaphy's stated reason for terminating Arredondo is pretext because an internal termination form, dated almost two months after Arredondo's termination, listed the reason for his termination as "theft." (Doc. 21-7, pgID 826). Arredondo argues that the discrepancy between Heaphy's testimony and the termination form is sufficient to establish pretext.

I disagree. Even if a plaintiff presents some evidence that a proffered reason for a termination is false, summary judgment for a defendant may still be appropriate "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue and there was abundant and uncontroverted independent evidence that no discrimination had occurred." *Griffin v. Finkbeiner*, 689 F.3d 584, 594 (6th Cir. 2012) (quoting *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 148 (2000)).

It is dubious at best that the reason for termination given on the form, "theft," was pretext for discriminatory animus. First, Heaphy's testimony makes clear that Arredondo's two infractions pertaining to uncharged food, in conjunction with his violation of the social media policy, informed Heaphy's decision to terminate him. (Doc. 17, pgID 737). This testimony establishes a nexus between defendants' purported rationale of "theft" and Arredondo's termination. More importantly, Arredondo himself testifies that Fowler called him to tell him that his Facebook post was the final tipping point for his termination. (Doc. 14, pgID 245). The testimonies of Swihart, Mangini, and Heaphy are consistent with Arredondo's testimony. (Doc. 16, pgID 624; Doc. 15, pgID 482; Doc. 17, pgID 730).

In sum, Arredondo has failed to show that defendants attempted to actively conceal from him the true reason for his termination. By Arredondo's own admission, Fowler told him that the Facebook post precipitated the termination decision. Arredondo cites *Cicero v. Borg-Warner Auto., Inc.*, for the proposition that a defendant's changing justifications for firing an employee establishes pretext. 280 F.3d 579, 592 (6th Cir. 2002). But the facts of *Cicero* are a far cry from the ones in the instant case.

The defendant in *Cicero* introduced a wholly new justification for the plaintiff's termination in its interrogatory responses and then introduced another separate rationale once the

case reached the summary judgment stage. *Id.* Neither of these rationales was communicated to the plaintiff prior to the commencement of litigation. *Id.* The Sixth Circuit was addressing specifically situations where "the justification for an adverse employment action changes *during litigation*. . . ." *Id.* (emphasis added). In contrast, when it terminated Arredondo, Beer Barrel, through Fowler, was candid with him regarding the influence of the Facebook post in that decision. In this context, the termination form stating "theft" does not give rise to an inference that defendants attempted to "hide the ball" regarding some discriminatory rationale for terminating Arredondo.

Therefore, even if Arredondo established his *prima facie* case, I would grant defendants' motion on the discrimination claims for Arredondo's failure to establish that their legitimate non-discriminatory reason for terminating him was pretext.

### 2.  Retaliation

Arredondo also brings claims of retaliation against defendants under Title VII, 42 U.S.C. § 2000e-3(a) and R.C. § 4112.02(I). He argues that the defendants disciplined and terminated him for complaining to Beer Barrel's managers that their decision to terminate Sacquoya White, an African-American server, but not Laura Mackenzie, a Caucasian dishwasher, for an attempted drug deal constituted racial discrimination.

As with a race discrimination claim, a plaintiff may establish a retaliation claim either with "direct evidence" or "indirect evidence" through the *McDonnell Douglas* burden-shifting framework. *Redlin, supra*, 921 F.3d at 613 (6th Cir. 2019) (citing *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014). I analyze retaliation claims arising under Title VII and Ohio law "solely under Title VII." *Abbott v. Crown Motor Co.*, 348 F.3d 537, 541 (6th Cir.2003) (internal citation omitted).

19

Arredondo is not arguing that there is any direct evidence of retaliation. He contends that the circumstantial evidence of retaliation satisfies the *McDonnell Douglas* burden-shifting framework. Under the *McDonnell Douglas* framework, a plaintiff must make out a *prima facie* case of retaliation by showing: (1) he engaged in an activity that is protected under Title VII; (2) the defendant was aware of the protected activity; (3) the defendant then took a materially adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and materially adverse action. *Redlin, supra*, 921 F.3d at 613 (6th Cir. 2019) (citing *Laster, supra*, 746 F.3d at 730).

If a plaintiff can make out a *prima facie* case of retaliation, the defendant then must articulate a legitimate, non-retaliatory reason for the termination. *Redlin, supra*, 921 F.3d at 613 (citing *Mansfield v. City of Murfreesboro*, 706 F. App'x 231, 236 (6th Cir. 2017)). The plaintiff then must show that the reason that the defendant articulates is actually pretext for retaliation. *Redlin, supra*, 921 F.3d at 614 (citing *Mansfield*, 706 F. App'x at 236).

### A. *Prima Facie* Case of Retaliation

Defendants argue that Arredondo fails to establish his *prima facie* case because he neither engaged in a protected activity nor showed a causal connection between the protected activity and adverse action. I agree that Arredondo has not established either of those elements.

"[O]pposing any practice that the employee reasonably believes to be a violation of Title VII" constitutes protected activity. *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000). A complaint to management about discriminatory employment practices can constitute protected activity. *Jackson v. Genesee Cnty. Rd. Comm'n*, 999 F.3d 333, 344-45 (6th Cir. 2021) (citing *Niswander v. Cincinnati Ins. Co.*, 529 F.3d 714, 721 (6th Cir. 2008)). A plaintiff need not make such a complaint "with absolute formality, clarity, or precision," but the complaint must go

20

beyond a "vague charge of discrimination." *Jackson, supra*, 999 F.3d at 345 (quoting *Yazdian v. ConMed Endoscopic Techs., Inc.*, 793 F.3d 634, 645 (6th Cir. 2015)).

Arredondo's verbal complaint to Beer Barrel managers that Sacquoya White's termination "wasn't fair" did not constitute protected activity. Arredondo testifies that his personal opinion was that "not just a colored person should have been fired." (Doc. 14, pgID 202). But he never indicates that he expressly discussed the issue of race discrimination when raising his verbal complaint to the managers. He testifies only to telling the managers that it was unfair for White to be the only employee terminated. (*Id.*, pgID 203). In fact, Arredondo goes on to clarify that "at no point during [his] employment at the Findlay Beer Barrel did [he] go to a member of management and make a claim of racial discrimination." (*Id.*, pgID 220).

Arredondo's own testimony makes clear that his verbal complaint did not put defendants on notice that he was opposing racial discrimination. *See Yazdian, supra*, 793 F.3d at 646 (citing *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989)). His testimony indicates only that he complained about the general unfairness of White's termination, which does not rise to the level of protected activity without some additional communication that he felt the unfairness was racially motivated. *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 701 (3d Cir. 1995) (holding that a letter written to human resources complaining about "unfair treatment in general" but without a specific complaint regarding age discrimination did not constitute protected activity under the ADEA).[14]

Arredondo further fails to establish his *prima facie* case because he admits in his testimony that there is no causal connection between his verbal complaint and any materially

---

[14] *See Fox v. Eagle Distrib. Co.*, 510 F.3d 587, 591 (6th Cir. 2007) (holding that "Title VII's anti-retaliation provision is similar in relevant respects to the ADEA's anti-retaliation provision").

adverse action on the part of defendants. In his deposition testimony, he responded in the negative when asked whether he "suffer[ed] any adverse disciplinary actions because of what happened, what [he] witnessed that day between Laura and Sacquoya." (Doc. 14, pgID 205). When defendants' counsel asked Arredondo whether he agreed that there was "no evidence" that his termination "had anything to do with this incident involving Sacquoya White," he replied in the positive. (*Id.*, pgID 206). These unambiguous admissions undercut any contention from Arredondo that there was causal connection between his verbal complaint and the subsequent discipline he received.

For all these reasons, Arredondo has failed to establish a genuine issue of material fact regarding his participation in a protected activity or a causal connection between such activity and a materially adverse action. He has therefore not established his *prima facie* case, and I could grant defendants' motion as to the retaliation claims on that basis. However, as with the race discrimination claim, I will apply the burden-shifting analysis to the evidence in this case.

## B.  Legitimate Non-Retaliatory Reason and Pretext

Even if Arredondo had established a *prima facie* case of retaliation, he cannot prove that the defendants' legitimate articulated reasons are pretextual for the same reasons he cannot do so with regard to his race discrimination claim. *See supra*.

I would therefore grant defendants' motion on the retaliation claims, even if Arredondo successfully made his *prima facie* case, due to his failure to establish that defendants' legitimate non-retaliatory reason for terminating him was pretext.

## Conclusion

Arredondo has failed to establish a *prima facie* case as to either his claim that Beer Barrel terminated him because of his race or because he raised a protected complaint as to race

22

discrimination against his coworker. In addition, he has failed to show that Beer Barrel's legitimate articulated reasons for his termination were pretext.

It is, therefore,

ORDERED THAT Defendant's motion for summary judgment (Doc. 19) be, and the same hereby is, granted in full.

So ordered.

/s/ James G. Carr
Sr. U.S. District Judge